VOROS, Judge
(concurring):
¶ 36 I concur in the majority opinion as a correct statement and application of the law. *844 Í write separately to express my concern with the law of extreme emotional distress as it presently exists in Utah, particularly as applied in the context of intimate relationships.
¶ 37 The facts of the present crime must be viewed against tbe backdrop of a relationship in which Scott was the usual aggressor. He would call Teresa names like “bitch” or “just anything ... that could hurt her and make her feel like she was a bad person.” In fact, his contact name for her in his cell phone was “Bitch Teresa.” Scott threatened “multiple times” to kill Teresa, promising that “ ‘one of these days Pm going to kill you.’ ” In fact, he did try to kill Teresa once, attempting to run her over with their SUV while their sons were in the back seat. Teresa jumped out of the way. The boys also saw Scott “get physical” with Teresa. One time he threw a towel at Teresa’s face and “started punching her in the gut.” Another time he “slammed” a vacuum into her legs.
¶ 38 Teresa would also get mad and yell, but she did not get as angry or aggressive as Scott. The boys never saw her “get physical” with him, call him.names, or threaten him. She did call the police a few .times. Scott called, the police too. During one of the police visits, Scott asked the responding officer to tell Teresa to “stop touching” him. In all, the police came to their home “six to eight times.” They arrested Scott on one occasion' (he pleaded guilty to domestic violence assault). Teresa obtained a protective order, they separated, but they soon got back together, On the day of the shooting, one of the couple’s sons received a. call from a friend who asked why the police were at his house; the son called home and nobody answered. He rushed home, worried that Scott had “finally killed her.” When the other son heard there had been a fatal shooting, .he worried that his “mom was dead.”
¶ 39 And what, according to Scott, ignited his extreme emotional distress? After a fight, he noticed a handgun missing; he heard Teresa on the phone with her mother; she yelled something to him; he stormed into the bedroom and saw her lying on the bed pointing her cell phone at him, In response, he grabbed a gun from the gun safe, cocked it, and shot her three times.
,140 I do not believe the law'should mitigate the culpability of one who kills under these circumstances. “What is generally known as the provocation defense has for two decades been criticized as mitigating violence committed by men against women in intimate relationships.” State v. Sanchez, 2016 UT App 189, ¶ 40 n.9, 380 P.3d 375, cert. granted, 390 P.3d 719 (Utah 2017) and 390 P.3d 727 (Utah 2017); It' now “is one of the most controversial doctrines in the criminal law because of its perceived gender bias; yet most American scholars and lawmakers have not recommended that it be abolished.” Carolyn B. Ramsey, Provoking Change: Comparative Insights on Feminist Homicide Law Reform,, 100 J. Crim. L. & Criminology'33, 33 (2010); see also Emily L. Miller, (Wo)manslaughter: Voluntary Manslaughter, Gender, and the Model Penal Code, 50 Emory L.J. 665, 667 (2001) (“Voluntary manslaughter has never been a female-friendly doctrine.”); Victoria Nourse, Passion’s Progress: Modern Law Reform and the Provocation Defense, 106 Yale L.J. 1331, 1332 (1997) (“Our most modern and enlightened legal ideal of ‘passion’ reflects, and thus perpetuates, ideas about men, women, and their relationships that society long ago abandoned.”); Laurie J. Taylor, Provoked Reason in Men and Women: Heat-of-Passion Manslaughter and Imperfect Self-Defense, 33 UCLA L. Rev. 1679, 1679 (1986) (“[T]he legal standards that define adequate provocation and passionate ‘human’ weaknesses reflect a male view of un-cjerstandable homicidal violence.”).
¶ 41 In my judgment, the law should mitigate the culpability of homicides only where society as a whole can to some degree share the rage animating the killing:
To maintain its monopoly on violence, the State must condemn, at least partially, those who take the law in their own hands. At the same time, however, some provoked murder cases temper our feelings of revenge with the recognition of tragedy. Some defendants who take the law in their own hands respond with a rage shared by the law. In such cases, we “understand” the defendant’s emotions because these are *845 the very emotions to which the law itself appeals for the legitimacy of its own use of violence. At the same time, we continue to condemn the act because the defendant has claimed a right to use violence that is not his own.
Nourse, 106 Yale L.J. 1331, 1393. This “warranted excuse” approach would mitigate the culpability, for example, of a man who murders his daughter’s rapist, but not one who murders his departing girlfriend. See id. at 1392.
¶ 42 But this is not the law in Utah. And here, at least some members of a properly instructed jury seemed to struggle with whether, on these facts, Scott was entitled to special mitigation. In this circumstance, under present law, I cannot say that my confidence in the verdict is not undermined. But like Judge Christiansen, I urge our legislature to revise section 76-6-206.6 so that it can no longer be used to mitigate the final act of abuse perpetrated by an abusive intimate partner.